And we'll hear the next case, United States v. Litvak. Thank you, Judge Chen, Cannon, Chan, McGammo, Williams, and Connolly for the appellant, Jesse Litvak, and I've reserved time for rebuttal. May it please the Court, this case presents the Court with a stark choice concerning the reach of the federal securities laws, a choice that this Court did not definitively make in its earlier decision. Under our view, a misstatement is material for purposes of the securities laws where it relates to the value of the underlying security. Under the government's view, by contrast, a misstatement is material as long as it concerns a fact relevant to the party's negotiations on the theory that the counterparty would have negotiated harder if only it had known the truth. That theory is unprecedented and it is also unsupported. The government cannot cite any previous prosecution in which it has pursued a similar theory, much less any case in which a federal court has accepted it. This Court did not sanction that theory in its earlier decision in this case. And if this Court were to accept that theory, nor is testifying that if he had known the true price that Mr. Litvak paid for the bonds, he wouldn't have paid as much as he did. Why isn't that sufficient to meet materiality? Judge Chin, that is precisely an argument, that he would have negotiated harder if only he had known the truth. And I would parenthetically note that we have our argument that even if you accepted the that statement, the statement that he credited Mr. Litvak's statement about the acquisition cost was based on his erroneous belief that there was an agency relationship. But for purposes of the legal sufficiency argument, I think that the critical point is that Mr. Litvak's statement here was no different from a statement about the reservation price. It was really the functional equivalent. And the government's theory really would criminalize all sorts of garden variety negotiation tactics. So if, for instance, a car dealer misstated his acquisition price for a car, suppose that we were negotiating for a car and you said you were willing to pay $20,000 and I was the car dealer and I said, well, I can't do that because I acquired the car from Mercedes for $21,000, when that was in fact not true. That would, under the government's theory, give rise to federal criminal liability for securities fraud. And again, there's no precedent for that. If he knowingly lied to me about what he got for it, and that's, and I'm factoring that in into my decision as to how much I would be willing to pay for the car, why isn't that material? In other words, if he's offering it to me for $20,000 and I think he's getting it at a loss, I'm thinking to myself, wow, what a great deal. But if in fact the $20,000 is more than he actually paid, then I'm being snookered. So the critical fact, Judge Chin, and this really underpins our legal insufficiency argument, is that on this record, it's really undisputed that any statement about acquisition cost was not taken into account by these sophisticated institutional buyers when they determined the value of the security. Now it is certainly true that, again, there were statements in the record to the effect that this was important because if a party had known the truth, they would have negotiated harder. But in our view, where the line is drawn, and I think that this is a very clear line, is between cases in which on the one hand, the acquisition cost is an input in the determination about the value of the security, and cases where it is not. And again, the evidence here really falls on the latter side of the line. Doesn't the acquisition cost include the amount that you're paying to the broker-dealer for services? In fact, it's directly relevant to it, else why else would he have lied? Judge Corman, it is not. And again, this is, I think, the reason why this issue of the principal agency distinction is so important. Here, there's no doubt that the counterparties are not paying for Mr. Litvak's services because he is a principal. It's an arm's length transaction. And so, what the parties are really discussing, to the extent that there's discussion. He got it at the price and substance, I don't have the exact words in front of me, but he got it for the price that was suggested by Norris. But it was still an arm's length transaction, and this goes to our factual insufficiency argument. When it comes to these BWIC trades, like the one underlying the sole count of conviction, there are really two separate transactions. Jeffries first acquires the bond from the party that is selling it, and then Jeffries engages in an arm's length negotiation here with Invesco. Invesco is, of course, free to walk away from that transaction at any time. And to the extent, Judge Corman, that the discussion was framed in terms of the number of ticks on top of the acquisition cost, that is a discussion about profit margin. No different from the discussion in the hypothetical I offered to Judge Chin, where, you know, a car dealer might say, I've acquired this car for X price, you know, I'm only going to clear an additional Y number of dollars on the transaction, and a counterparty agrees. And that has never been viewed — Is it different if I say to the car dealer in advance, see if you can get me this car for X dollars? And he comes back, and he's gotten it for something less than X dollars, but he tells me, oh, yeah, I got it for X dollars. I don't think so, and I think, if anything, that explains why, even under the government's theory — In fact, he got it for less than I had asked him to get it for. I might say in the end, okay, you know what, you did well, you can have the extra, but wouldn't I want to know that? Subjectively, you might want to know that in the same way that you would always want to know someone's real reservation price. If I were in a negotiation with a counterparty for any sort of transaction, that would be something I would really want to know, because I would tailor my own negotiation accordingly. But that has never been viewed as — It's not material. That has — Even if it's something you would really want to know. Again, I would ask my friend Mr. Francis to cite a case for that proposition, that merely because you really want to know it, it's material as a matter of law. That has never been true at common law. We cited cases to that effect in our brief, and the government did not dispute that proposition. The government at most tried to argue that federal securities law somehow applies a more expansive standard. Would it be wrong to put the issue to a jury and let a jury decide whether it was material? As you are well aware from your long experience, Judge Chin, there are legal bounds on materiality. Going all the way back to the Supreme Court's decision in TSC Industries, the Supreme Court has indicated that while it is a mixed question of law and fact, and that it should go to the jury, there are legal bounds. And I would respectfully submit that since the earlier decision in this case, the Seventh Circuit issued its decision in the Weinman case, where the Seventh Circuit said — and about reserve prices and other terms and their relative importance — should not be considered material because, quote, negotiating parties do not expect complete candor about negotiating positions. I think if this Court were to reach a different decision in this case, it would create a circuit conflict on a crucially important question. And this theory of prosecution is being pursued by the District of Connecticut in a number of cases. There are other cases on the way to this Court that present materially similar facts. There are plea agreements that depend on the outcome of this appeal. And so I would respectfully submit that this is a very important issue. This is to federal criminal securities fraud what the Newman case was to insider trading. And I think if this Court were to affirm the government's legal theory here, it would plainly create a circuit conflict with Weinman. Now, I want to say just one more word about the factual sufficiency argument and the evidentiary issues, and then, of course, I'll hand the podium over to my friend, Mr. Francis. On the issue of factual sufficiency, I do think that there are two critical facts that I just want to lay on the table very quickly about count four, the count of conviction. The first is that this count was unusual because in the retrial, and really for the first time, Mr. Norris, the representative of the counterparty, admitted that he had purchased the bond at issue for the price that ex ante he was willing to pay. If you take a look at the record and you take a look at page 47, Mr. Norris, ex ante, indicated that he was willing to pay $79.24, the amount that was bid, plus six ticks, and that he had some room above that. And I think critically, to the extent that Mr. Norris testified that it would have been important, as you pointed out, Judge Chin, for him to have known the true acquisition cost, he said that he believed Mr. Litvak because, quote, he's supposed to be acting in my best interest, and, you know, I accept what he tells me in that instance as the truth. And that's at page 480. And so the reason we would respectfully submit that the jury returned a guilty verdict on this count, when it acquitted on all of the others, was precisely because of this testimony, this testimony that there was a belief that there was, in fact, a principal-agent relationship here, when, in fact, as the government now finally grudgingly concedes that was erroneous as a matter of law. We believe that Judge Hall also erred for precisely the same reason when she admitted that testimony. And quite frankly, I think — Why don't you finish the point? Yeah. I think her decision to do that was confounding because the district court itself recognized that, in fact, there was no principal-agent relationship as a matter of law. And the last thing I would say before sitting down for rebuttal is that the government really went to town on that point in its closing when Mr. Francis said that, quote, the critical thing is that the victims thought that Mr. Litvak was acting as their agent. He created the perception. And the government asked the jury to find that Litvak, quote, established a relationship of trust with the fund managers. And that's at pages, I believe, 643 to 444 of the joint appendix. And I would respectfully submit that even if this court were to disagree with us on the crucially important legal theory, that that would at a minimum require a vocator. Wasn't there a jury charge that explicitly told the jury that there was no agency relationship? There was as a matter of law, but I think that that is precisely, Judge Corman, what makes the admission of this evidence so confounding and that gave rise to a very real risk of confusion. If, in fact, everyone agreed that as a matter of law there was no such relationship, then why should this testimony of perception have come in, particularly because, as Your Honor is aware, the question of materiality turns on what a reasonable investor would have thought, whether a reasonable investor would have deemed a particular representation important in making an investment decision. And the government, both at trial and before this court, has made no effort to connect that conceitedly erroneous perception that there was an agency relationship to what a reasonable investor would have thought. I'll reserve the balance of my time. Thank you.  This is Judge Winter in New Haven. Could you deal with this last point raised by the attorney first? Why was there any evidence admitted as to the buyer's state of mind when that state of mind was based on something that, as a matter of law, was wrong? I can, Your Honor. I'm Jonathan Francis for the government. So in the prior decision by this court, the court held that the nature of Mr. Litvack's relationship with the alleged victims forms the context in which the jury had to consider whether the portfolio managers and traders who testified reflected the view of a reasonable investor. Judge Hall relied on that. She cited that in her order on the motion in Lemonet before trial to say that the victims' testimony about how they perceived what they were doing with Mr. Litvack, the facts of those trades, is relevant to the determination of whether or not those perceptions fall within what the jury had to determine, whether they fell within what a reasonable investor would have thought. It certainly is relevant, but I just don't understand why you admit evidence of a mistake and then you charge the jury that it was a mistake. It just seems to me very confusing, and the matter's not helped that this is the only common conviction. Well, Your Honor, with due respect, I think that would be confusing, but that's not really what happened. What Judge Hall said was the fact that a victim might colloquially use the word agent in testifying about the facts of a transaction doesn't mean that they can't talk about what their perception was. And here, two victims, Mr. Norris and Mr. Woolman, so that counts four and counts nine and ten, testified using the word agent, but both of them defined the word agent not legally. They weren't there to testify about a fiduciary relationship. They used it to mean facilitator, an intermediary, meaning they told Mr. Litvack, please do this. Mr. Litvack volunteered to do that thing. Wasn't there testimony that the buyer in the count of conviction said he thought Litvack was bound to work on his behalf? There was that testimony, Your Honor, and to put it in context, that was about eight or ten words in an eight-day trial. It was the one time anyone made any reference to that. The government elicited... I mean, if you want to count words, there are a lot of words in that trial compared to the counts of conviction. That's true. And all that evidence is relevant to the jury's determination of materiality. So this one oddball thing that... I agree with you on materiality, but I just don't understand why there was evidence that somebody was mistaken, sympathetic evidence that might have led somebody to convict him when the guy was just wrong as a matter of law. Well, Your Honor, with due respect, I think if you look at the... I'm sorry. You convict somebody based on the buyer's misapprehension as to the law? No, Your Honor, and I want to be clear here. The defense would have it that what the government did was go up there, put a victim on the stand, and mislead the jury as to what legally was going on here. Throughout the trial, everyone, including the government, explicitly said there is no legal agent relationship here, there are no special duties. The government actually argued that in our rebuttal closing. It wasn't me, although it was well done, I accept Mr. Shamegain's compliment. It was one of my co-counsel who made that argument to the jury. There was an instruction. What the victims testified was that they understood that Mr. Litvak was carrying out their orders, and the reason they thought that was because Mr. Litvak lied about whether or not he was carrying out their instructions. No one said anything about this idea that he had some heightened duties, except with respect to Mr. Norris, and that's that one oddball thing. This happened on redirect. This was not a plan set piece by the government. It was in response to the defense attempting to get him to say that he took everything that Mr. Litvak said with a grain of salt, and Mr. Norris' response to that, which then we brought out and amplified on redirect, was that real-time information about objective facts, material to price, so things that relate to price, are not the sort of information he takes with a grain of salt. And then he said, in the course of that entire answer, in the middle of it, he said, he's supposed to be working on my behalf. Clearly wrong. The defense didn't even stand up and ask for recross on that point. No one mentioned it in closings, either the defense or the government. And so I think in context, Your Honor, and this is why I don't propose to count words, but I think in context, this is an aberrant statement in the course of a trial that no one relied on. But even if there was some problem with this, Judge Hall was aware that there was the possibility that this could mislead the jury. And so she took that into account in her pretrial ruling, and she put up some guardrails. The first guardrail was cross-examination, which the defense chose not to avail themselves of with respect to this working on my behalf statement. They did cross-examine Mr. Norris and Mr. Woolman about use of the word agent versus principal so that they had access to that. Also, there was expert testimony. And I'll remind Your Honors, Judge Winter, you and I have actually talked about materiality in the context of this case previously when Mr. Litvack was here on his bail motion the first time, I believe. Then Your Honor, along with the rest of the panel, held that there was a substantial question. That question got answered in 2014 or 2015 decision. And one of the things Mr. Litvack was complaining about in that appeal was that Mr. Woolman in the first trial testified using the word agent, and Mr. Litvack, the defendant, didn't have an opportunity to call his expert on this principal-agent question. In the second trial, he got that. He had the expert he wanted. The expert testified, and then the third guardrail the judge put in place was a jury instruction, which the defense didn't ask for it to be a curative instruction at the time of Mr. Norse's testimony. They were content to wait until the jury charge. And that was an instruction that came in without objection from the government, and it was the instruction that the defense wanted. They didn't object or ask for further instruction on this point about supposed to be working in my best interest. They were happy with the instruction that they got, which told the jury that agents owe duties to their fiduciary. No one, or Mr. Litvack in this case, was never operating as an agent. So with those three safeguards in place, plus what the government's explicit kind of disclaimer that we were not relying on this mistaken idea, and in fact what we wanted the jury to focus on in this testimony was the false relationship of trust or the misplaced relationship of trust that Mr. Litvack was able to create in his victims. And the way he did that was he said things like what he said to Mr. Norse in count four. Mr. Norse submitted a bid of $79.75. Mr. Litvack said, I'm using your bid. That's a statement, much like, Judge Chin, your statements that you were positing to Mr. Chamigan, that's a statement related to price. In an auction where Mr. Norse has no alternative, the defense says, well, he, if he really cared, he could have gone out and tested the veracity of that information that Mr. Litvack was using his bid. But as Mr. Norse told the jury, the only way to do that is to go out and bid against himself, submit a second bid through a second broker-dealer. So what good does that do him? He's just driving up the price against himself. Mr. Litvack then returned to him and said, I used your bid. He doubled down on the lie and said, I will work for whatever you want, big man, telling Mr. Norse, explicitly telling Mr. Norse, that he had not taken his bid and then chosen to act as a principal and gone and bid and taken on market risk and then was now going to sell it to Mr. Norse at that $79.75 price. Instead, what he said was, I used your bid, and so now we need to engage in a conversation about how much you pay me. Mr. Norse testified about this to the jury, said there's two ways these transactions can go. There's way one, where he says he's going to use my bid, and way two, where he backs up my bid, or he bids something lower, and then I pay my original bid price. Mr. Litvack was using way two, but he lied and said he was using way one. The end result of all this was that Mr. Norse ended up paying 14 ticks, thinking he was paying six ticks. Now, that six-tick price was something that Mr. Norse proposed to Mr. Litvack, and Mr. Litvack accepted. It was a short negotiation, but in context, the entire negotiation was only 11 minutes from the time that Mr. Norse bid $79.75 to the time that the trade is completed. So the fact that it all happens very quickly is consistent with what happens in this market. Now, Mr. Shimmigan also addressed a number of other points with respect to legal insufficiency versus factual insufficiency. The legal insufficiency point he makes was addressed by this Court in its 2015 decision. While Mr. Shimmigan points out a couple variations in the record between the two trials, as Judge Hall said, and she was the trial judge in both cases, the evidence was essentially the same with respect to materiality in both trials. Those are her words, essentially the same. Ordinarily, this Court doesn't revisit its prior findings. This Court has said it's neither appropriate nor possible to reverse existing circuit precedent. Here, the government submits that the existing precedent is that in cases of this sort, where broker-dealers lie in the RMBS market, an opaque market about facts that are material to price, that can be material, and it's a question, a mixed question of law and fact that goes to the jury. Finally, Your Honor, if I may make one point more briefly, the defense has repeatedly in its briefing and now in its argument said that the government's theory of prosecution is that anything that causes someone to negotiate harder is material. That's not true. And, in fact, I don't think that case law supports that, but that's never been our theory. Our theory, since we indicted this case in 2013, has always been that a lie about an objective historical fact that duped someone into increasing their purchase price can be material, and it's a question of, a mixed question of law and fact that must go to a jury for determination. It's only in the, speaking not about our theory, but just with respect to the circuit's law, it's only where it could never be material that this court has taken that question away from a jury. We didn't charge here that the bond was printed on blue paper when it really was printed on white paper. What we charge is that Mr. Litvak lied to rip off his customers of millions of dollars, and he did it knowing that what the end result was going to be and the testimony to the jury was, was that his victims relied on that, or at least with respect to count four, Mr. Litvak lied to him, it hurt his employer, and it hurt their investors. There are no further questions, Your Honor. Thank you very much. Thank you. We'll hear the rebuttal. Just one word on legal sufficiency, and then I want to address the evidentiary issue. On the issue of legal sufficiency, my friend Mr. Francis said that any statement that goes to price is material. That is not the standard. The standard is whether a misstatement in this court's words is capable of affecting the value of the underlying security, and just a few seconds ago, Mr. Francis suggested that the limiting principle on this notion that statements relating to price are material is where the statement involves an objective historical fact. But if you take my hypothetical involving the car buyer, it is very easy to render a statement about the reservation price objective and historical. I could say that I bought the car from Mercedes for $20,000. I could say that my boss told me that I can't go any lower than $20,000. That will provide very little limit on a principle that would reach any negotiation fact, and with respect, this court's prior opinion did not definitively resolve this issue. To the extent that it addressed the government's theory in footnote 20, it rejected the government's effort to extend materiality beyond statements that affect the value of the relevant underlying security. That is the danger with the government's theory and the remarkable overbreath that would result from upholding it. On the evidentiary issue, I want to just rebut very briefly Mr. Francis's characterization of what took place at trial. All of the witnesses, Mr. Norris included, testified that they were skeptical about volunteered information, that they took those sorts of statements with a grain of salt. And my partner, Mr. Butzwinkas, got Mr. Norris to concede that at page 477 of the joint appendix during the cross-examination, and many, many other witnesses testified to the same effect. It was in that context that when the government got up on redirect, it got Mr. Norris to say that this case was different. And this case was different because Mr. Norris believed that Mr. Litvak was, quote, supposed to be acting in my best interest, and you know I accept what he tells me in that instance as the truth. And however many words that is, and however many words it is compared to the entire trial as a whole, that is a statement that he believed that there was a special relationship, an agency relationship, which rendered this statement different from all of the other statements involving volunteered information that he did not credit. And again, the government went to town on this, and Mr. Nardini, who in fact was the government lawyer who made the closing on this point, went further. He not only said, quote, that Mr. Litvak had, that the victims, quote, thought Mr. Litvak was acting as their agent. He actually tested, he actually argued at page 643 that Mr. Litvak, quote, created the perception, and that was particularly egregious because there was no testimony to that effect. And while Mr. Francis points out that there was another counterparty, Mr. Woolman, who also testified to that effect, his testimony was much more ambivalent, and there were very good reasons why the jury could have treated his context differently from the context of Mr. Norris. The only rational explanation for what took place in this case was that the jury convicted on count four because of this distinctive testimony about the belief that there was a principal-agent relationship. That testimony bears no nexus to the reasonable investor standard. It creates an enormous risk of prejudice, notwithstanding the things to which Mr. Francis pointed. And for that reason, at a minimum, we think that this court should vacate, if not reverse outright, because of the flaws with the government's legal system. So that when Litvak told Norris that he had secured the bond at this price point, that was a false statement? We are certainly not disputing that there was a misstatement in this case, Judge Corman. And Norris was, Norris should have known because everybody in this business is a liar. Well, there was abundant testimony that with regard to this sort of statement, these sorts of statements were not credited. And indeed, there was at least one counterparty, Mr. Woolman, who testified that he made similar misrepresentations in return. Now, we may not like that. We may not like it whenever someone makes a misrepresentation. But that does not give rise to federal criminal liability. The whole point of the materiality requirement is that you look at what a reasonable investor would have thought, and that naturally takes into account what sophisticated institutional investors in this market believe. The testimony on this record was that these sorts of statements were not credited, and further, that these sorts of sophisticated institutional investors conducted their own valuation to determine the returns. What they cared about was the total price that they were paying, because that was what dictated the returns on these transactions. No, but the total price they were paying included the compensation to the broker-dealer. Why did the broker-dealer lie, assuming, as we must, that he lied? Presumably to get a higher price in the same way that car dealers and others do in negotiation. But courts have routinely held that puffery, sales chatter, and the like does not rise to the level of materiality. And again, this is the critical difference between our two views. Our view is that a statement has to go to the value of what you are getting. It has to go to the quality of the goods, or something of that variety. A statement that merely relates to price, and again, it's really all about reservation price here. Of course, one would like to know the acquisition cost of a particular product, because if you know what someone's reservation price is, you are going to negotiate harder. That is really what this is all about, and if you look at the testimony of the counterparties when they say, you know, it would have been important to me to know. The reason why they say that, I would respectfully submit Judge Corman, is because they would have liked to know, because then they could have negotiated harder, and yes, gotten a lower price. But even lawyers are not subject to that duty. If you look at the model rules, even a lawyer is not viewed as making a misstatement for purposes of, I believe it's rule 4.1, if it is a statement concerning reservation price, a negotiation fact. And again, that's why we think that if this Court accepts the government's theory, it is impossible to reconcile that outcome with the Seventh Circuit's outcome in the Weimart case. And for that reason, you know, I would urge the Court to think hard about the legal issue, even though there are narrower grounds for, at a minimum, a new trial. Thank you. We'll reserve decision.